DONALD D. and F. DIANE FAGELMAN, [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Fagelman v. Commissioner
Docket No. 7633-72.
United States Tax Court
T.C. Memo 1974-199; 1974 Tax Ct. Memo LEXIS 118; 33 T.C.M. (CCH) 864; T.C.M. (RIA) 74199; July 31, 1974, Filed. Donald D. and F. Diane Fagelman, pro se. Howard S. New, for the respondent. *119 QUEALY
MEMORAMDUM FINDINGS OF FACT AND OPINION QUEALY, Judge: Respondent has determined deficiencies in the income tax of petitioners for the taxable years 1968 and 1969 in the amounts of $1,104.17 and $1,431.53, respectively. Due to concessions by the parties, the sole question before the Court is whether any of the amounts paid to petitioner F. Diane Fagelman by Siani Hospital and the University of Texas Southwestern Medical School from National Institute of Mental Health grants in each of the taxable years 1968 and 1969, for her participation in their respective residency programs is excludable from gross income as a fellowship grant under section 117. [2]
FINDINGS OF FACT Some of the facts have been stipulated. Such facts and the exhibits attached thereto are incorporated herein by this reference. Petitioners Donald D. Fagelman and F. Diane Fagelman (hereinafter referred to as "petitioner") are husband and wife, whose legal residence at the time of the filing of the petition herein was Dallas, Texas. [3] They filed timely joint Federal income *120 tax returns for the taxable years 1968 and 1969. Petitioner received a Doctor of Medicine Degree from Wayne State University College of Medicine (hereinafter referred to as "Wayne State"), Detroit, Michigan, in June 1966. She was licensed in January of 1967 by the Michigan State Board of Medical Examiners to practice medicine in the State of Michigan. In January of 1969, she was licensed to practice medicine in the State of Texas. From July of 1966 to June of 1967, petitioner completed a 1-year rotating internship at the Siani Hospital in Detroit, Michigan (hereinafter referred to as "Siani"). In July of 1967, petitioner entered a 3-year residency training program in general psychiatry at Sinai. She completed only one year of residency at Sinai, at which point she transferred into a 4-year residency program in child psychiatry at the University of Texas Southwestern Medical School (hereinafter referred to as "Southwestern"). It is the payments received by petitioner from Sinai during the first six months of 1968 or *121 the last half of her first year of residency at Sinai with which we are initially concerned. Sinai is a general, private nonprofit hospital which is an organization described in section 501(c) (3) and exempt from tax under section 501(a). The medical staff at Sinai consists of practicing physicians who use the hospital for their patients. Patients are admitted on the recommendation of staff physicians engaged in private practice or through the outpatient clinic on the recommendation of the residents. The hospital maintains a working affiliation with Wayne State and has a full-time teaching faculty who are drawn either from Wayne State or the Michigan Psychoanalytic Institute. Although Sinai is known as a teaching and research institution, its primary function is to provide medical care to its patients. [4]
For the first six months of 1968, as well as throughout her first year of residency at Sinai, petitioner was assigned nine patients. She generally saw each of her patients daily for the purpose of *122 observing them and noting their progress. Her evaluation, diagnosis and treatment of patients were subject to the close direction and supervision of the staff physician who at all times maintained ultimate responsibility for such patients. During this period, petitioner spent approximately 10 hours a day and 6-1/2 days a week at Sinai and was on emergency room call approximately every eleventh night, including weekends and holidays. Her activities included acting as a consultant on referrals from other specialties; prescribing drugs; writing patients' histories; admitting patients; physically examining patients; performing a teaching function at Sinai with an assigned medical student; evaluating and treating patients under supervision; and attending didactic instruction as well as supervisory sessions. Some of the duties performed by the petitioner and other residents for Sinai would have required the attention of a staff physician or trained psychiatric employee had the petitioner and other residents not been available. The additional presence of the residents enhanced the quality of medical care Sinai offered to its patients. Being listed by Sinai as part of its house staff, *123 petitioner was neither registered as a student nor was a candidate for any academic degree. [5]
During the first six months of 1968, petitioner was paid a total of $6,472.56 by Sinai from which Federal income and insurance contribution act taxes were withheld. Of this amount, $1,800 was attributable to grants which Sinai received from the Department of Health, Education and Welfare, Public Health Service, National Institute of Mental Health (hereinafter referred to as "NIMH"). The balance was attributable to a regular resident salary paid to petitioner by Sinai. None of the amounts paid to petitioner by Sinai was determined on the basis of financial need, but on the basis of a fixed sum for each level of residency, which increased yearly as the resident attained additional skill and experience. In addition, petitioner also received from Sinai 2 weeks paid vacation per year, free hospitalization coverage and medical care, free malpractice insurance, free laundry for uniforms, accrued sick leave for illness, and was provided an office space and free parking space. On her joint income tax return for *124 1968, petitioner excluded from gross income $2,400 of the amounts received from Sinai ac constituting a fellowship grant. She has since conceded that the maximum allowable under the statute is $1,800. Respondent contends that no part of the amounts received from Sinai is excludable. In September of 1968, petitioner transferred to a 4-year residency training program in child psychiatry at Southwestern, an organization described in section 501(c) (3) and exempt from tax under section 501(a). The child psychiatry program at Southwestern called for petitioner to spend her first 2 years in the general psychiatry rotation while the latter 2 years were to be spent in the child psychiatry rotation. Petitioner, being given credit for her first year of residency at Sinai, completed the full program at Southwestern in April 1972 with an interim interruption for maternity leave. The residency program at Southwestern was coordinated with several hospitals in the Dallas area, including Parkland Memorial Hospital (hereinafter referred to as "Parkland") and Children's Medical Center of Dallas (hereinafter referred to as "Children's"). [6] The residents would often be rotated through several *125 of these affiliated hospitals during the course of their training, in addition to being assigned to certain psychiatric clinics operated by Southwestern. The clinics were organized to provide certain facilities or experience that was required for an approved residency in general or child psychiatry but was not available at any of the affiliated hospitals. [7]
During her first four months in the residency program at Southwestern, petitioner was assigned to Parkland. Parkland, in conjunction with Woodlawn Hospital (hereinafter referred to as "Woodlawn") is operated by the Dallas County Hospital District (hereinafter referred to as "DCHD"), a public body created and organized under the laws of the State of Texas primarily for the purpose of supplying medical *126 care to indigent and needy residents of Dallas County. Pursuant to an agreement between the DCHD and Southwestern in 1967, it was agreed that Southwestern would be responsible for staffing both hospitals with "a sufficient number of qualified physicians to adequately direct and supervise professional medical services to all inpatients and outpatients" at Parkland and Woodlawn. Accordingly, the permanent staff at both hospitals is drawn directly from the faculty of Southwestern, and the doctors who serve as heads of the departments, divisions, or services of Southwestern, assume the same positions of authority at the hospitals. In exchange therefor, Southwestern was granted the opportunity to use the hospitals' facilities for clinical teaching and research for its medical students, interns, and residents under conditions of actual responsibility for patient care. Parkland is a general hospital which serves as the primary teaching facility of Southwestern and is located immediately adjacent thereto. Woodlawn is a special hospital which is located at some distance from Southwestern and is primarily devoted to the treatment and care of adolescent and adult patients with serious *127 mental and nervous disorders. Both hospitals admit patients on the basis of their medical need rather than restricting admissions to cases involving unusual teaching aspects. [8]
The residents were appointed to these hospitals by the DCHD upon the nomination of the chiefs of the appropriate department, division, or service responsible for the supervision and training of such personnel. Pursuant to the terms of the above agreement, the expense of hiring such interns or residents was borne entirely by the DCHD although Southwestern agreed to assist where it was able to obtain special funds for the training programs of certain interns and residents. While assigned to Parkland for this last quarter of 1968, petitioner worked at Parkland's psychiatric outpatient clinic approximately 22 hours per week. Petitioner *128 was also on emergency room call approximately every seventh to eighth night, including weekends and holidays. Weekday emergency call required staying at the hospital for 15 hours while weekend call required 24-hour attendance. When on emergency room call, she was the only physician of her service physically present at the hospital. Her duties at Parkland were similar to those of any salaried staff physician and included evaluating outpatients in the outpatient clinic; responsibility for the diagnosis and treatment of patients; acting as a consultant of referrals from other specialties; prescribing drugs; writing patients' histories; discharging patients from the outpatient clinic; admitting patients to the outpatient clinic and to the inpatient unit while on emergency room call; and participating in individual and group therapy sessions with patients. Patients were assigned to petitioner on the basis of rotation, not on the basis of the training aspects of the case. From January through June of 1969, petitioner was assigned to the consultation service rotation at Parkland. This involved seeing patients on medical or surgical wards to offer advice on care and treatment and *129 accounted for approximately 3 patient-related hours per week. She also continued to serve on emergency room call at Parkland throughout this period. During this same period, petitioner was also assigned to Children's Psychiatric Clinic (hereinafter referred to as "CPC") at Southwestern. At CPC, she carried a six-patient load which involved approximately 9 to 10 patient-related hours per week. She was expected to do and did diagnostic evaluations of her patients and, on occasion, their families. In addition, she saw patients regularly in therapy sessions. Her activities at CPC were subject to the direction and control of the clinic's staff. All patients requesting help through CPC could not be seen. Instead, patients were selected depending on the teaching needs of the clinic at the time. An attempt was made to accept a wide range of problems in children of various ages from different cultural groups. Fees for care at CPC were determined by a sliding fee scale which considered the monthly income of the patient's parents, the number of dependents and their debt status. After determining these factors during the initial interview, the resident would set the patient's hourly *130 fee according to a published fee schedule. Fees ranged from approximately $1 to $20 per hour depending upon the financial status of the patient's parents. During the summer of 1969, petitioner served in a neurology service rotation at Parkland which involved seeing patients under the supervision of the medical staff to learn diagnostic skills in the field of neurology. In October of 1969, petitioner was assigned to Children's is a private, nonprofit hospital which provides for the examination, diagnosis and treatment of children. The hospital was created primarily to furnish medical aid and hospital care to patients admitted by the medical staff of the hospital and was not established as an institution for teaching and research. It admitted patients on the basis of the patient's medical need and did not restrict admissions to those cases involving unusual teaching aspects. Being a hospital affiliated with the Southwestern residency program, its consulting staff was composed of many of the faculty from Southwestern. While at Children's, petitioner was assigned to the psychiatric inpatient unit where she carries a two-patient load which involved approximately 3 hours per *131 day, 5 days a week. Her evaluation, diagnosis, care and treatment of patients were subject to the close direction and supervision of the hospital's medical staff. In addition, petitioner participated regularly in individual and parent group therapy sessions. Her other duties at Children's included acting as a consultant on referrals from other specialties; prescribing drugs; writing patients' histories; evaluating and following up on approximately 2 outpatients. Concurrent with her assignment to Children's petitioner also was assigned duties at the Adult Psychiatry Clinic (hereinafter referred to as "APC") at Southwestern. While at APC, she carried a three-patient load which accounted for approximately 6 to 7 patient-related hours per week. [9]
The training the petitioner and other residents in child psychiatry received from the duties they performed at Parkland, Children's and the clinics was essential *132 for an approved residency in child psychiatry. Another prerequisite was formal didactic instruction by means of prepared lectures, seminars, assigned reading, roundtable conferences, journal clubs and lectures by visitors. Petitioner attended such didactic instruction throughout the years in question which, dependent upon her rotation would account for approximately 15 to 20 hours a week. Almost all of the duties performed by the petitioner and the other residents for the DCHD and Children's would have required the attention of a staff physician or other trained psychiatric employee had the petitioner and other residents not been available. The additional presence of the residents at Parkland and Children's enhanced the quality of medical care those hospitals offered their patients. Being listed on the house staff of both hospitals, petitioner was neither registered as a student nor was a candidate for any academic degree. Throughout the period in question at Southwestern, petitioner was under contract with the DCHD. By the terms of the contract, she agreed to "conform to all rules and regulations governing the institution, discharging all duties of House Staff Officer as *133 determined by the Management and Staff." Upon satisfactory completion of her duties as a resident or intern, the DCHD agreed to issue a certificate indicating satisfactory performance of such duties. Such certificate would be forfeited if she failed to remain in service for the full time of her contract. The contract further provided that petitioner was prohibited from engaging in any form of private practice extent in those instances which had been given prior approval and which applied to all members of the house staff. While on the house staff at Parkland, petitioner had Federal income and insurance contribution act taxes withheld from monthly payments from the DCHD which kept employee records on petitioner reflecting an hourly wage rate and a specific job code number. Petitioner also received 2 weeks paid vacation per year, free hospitalization coverage and medical care, free laundry for uniforms, a meal allowance, sick leave and was eligible to join the DCHD employees credit union. For the last quarter of 1968 and the full year 1969, petitioner received the sums of $1,935.31 and $6,462.91, respectively, from the DCHD. Petitioner did not exclude any of these amounts from *134 gross income during the years in question and has conceded such amounts represent compensation for services rendered at Parkland. She received no monies from Children's during the period in question. Petitioner also received during 1968 and 1969 the sums of $1,833.32 and $6,333.36, respectively, from Southwestern for her participation in that school's residency program. None of the amounts paid to petitioner by Southwestern was determined on the basis of financial need, but on the basis of a fixed sum for each level of residency, increasing yearly as the resident attained additional skill and experience. The source of these funds was NIMH trainee stipend grants to Southwestern. The NIMH publication entitled "Grants and Awards of the National Institute of Mental Health for Graduate and Undergraduate Training" (December 1966) states the primary purpose of such grants is "to improve the quality of mental health training; to enlarge the capacity for training people; to help in the development of specialized training programs; and, through trainee stipend awards, to enable a greater number of persons to pursue careers in the mental health disciplines and related areas." The publication *135 further provides that such grants are not awarded directly to individuals by the NIMH but that the training institutions are charged with the disbursement of funds and the selection of the qualified recipients. Aside from a few minimal educational and citizenship requirements, the selection of qualified recipients is left entirely up to the discretion of the grantee institution. Receipt from Southwestern for such training stipends funded by the NIMH grants was conditioned upon satisfactory participation in all aspects of the residency program. Those residents who received equivalent amounts of money from other sources were not selected for NIMH grants so that a uniformity of pay scale could be maintained at each level of residency. [10]
On her joint income tax returns for 1968 and 1969, petitioner excluded from gross income $1,200 and $3,600 of the above amounts received *136 from Southwestern as excludable fellowship grants. Respondent contends none of such amounts are excludable. OPINION The sole question for our decision is whether any of the amounts paid to petitioner by Sinai and Southwestern from NIMH grants in 1968 and 1969 for her participation in their respective residency programs is excludable from gross income as a fellowship grant under section 117. The circumstances under which petitioner received payments from Southwestern in 1968 and 1969 are indistinguishable in substance from those involved in Geral W. Dietz, 62 T.C. [*] (July 31, 1974), with which this case was consolidated for purposes of trial. For the reasons stated therein, we hold that none of the amounts qualified for exclusion under section 117. With respect to the payments received by petitioner from Sinai in 1968, such amounts likewise fail to qualify for exclusion under section 117. In view of the substantial and valuable services performed by petitioner for the hospital during the period in question, such amounts must be characterized as compensation for services rendered. . Decision will be entered for the *137 respondent. Footnotes
1. The following cases were consolidated herewith for purposes of trial only: Thomas A. Woods and Georgialy W. Woods, docket No. 7120-72; Geral W. Dietz and Johanna C. Dietz, docket No. 7147-72; Byron L. Howard, Jr. and Sharon K. Howard, docket No. 8532-72. Separate opinions will be issued for each case. ↩
2. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. ↩
3. Donald D. Fagelman is a petitioner herein only by virtue of having filed a joint return with his wife, F. Diane Fagelman, for the years in question. ↩
4. During the taxable years 1967 and 1968, Sinai's psychiatric service inpatient facilities consisted of approximately 36 beds which averaged almost 100 percent occupancy. ↩
5. House staff is a term used to refer only to residents and interns. ↩
6. The official title of the program was "Southwestern Medical School Affiliated Hospitals Residency Program." ↩
7. In order for a residency program to be approved by the American Board of Psychiatry and Neurology and the Council on Medical Education of the American Medical Association, it had to meet the requirements of the Essentials of Approved Residencies, which are published by the Council for each specialty or service. ↩
8. During 1968 and 1969, Parkland admitted over 330 psychiatry inpatients and had an average daily psychiatry inpatient census of more than 40, representing 14,600 inpatient days. With respect to psychiatry follow-up matters, approximately 6,000 persons or an average of 16 or 17 persons per day were treated through the hospital's outpatient clinic and emergency room. ↩
9. As a result of her interest in community psychiatry, petitioner also spent 2 mornings a week during this same time period at the Student Medical Health Clinic of Southwestern Methodist University in Dallas. She received no pay from the University for these services. ↩
10. For instance, the residents in psychiatry who were assigned to either the Veterans Administration Hospital or Terrell Hospital, which was run by the State of Texas, would receive as a base salary from those hospitals the equivalent of what petitioner received from the DCHD and the NIMH grants combined. ↩